**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **NRI ATM, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **PLANT SERVICES, INC., METAL** | § | |
| **WORKS, INC., ALVIN BELL, and RUBEN** | § | **CIVIL ACTION NO. _____** |
| **REYNOSO,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |
| | § | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plant Services' corporate raiding destroyed a business worth millions of dollars. At the end of 2018, Plaintiff and Plant Services each expressed interest in purchasing a metal fabrication business called ATM Machine Works, Inc. from its owner, Alfred Domingue. Ultimately, Plaintiff was the successful purchaser and agreed to pay millions of dollars in total deal consideration to acquire ATM's assets. Plaintiff agreed to pay that sum because it believed the employees, goodwill, and intellectual property of ATM were extremely valuable: indeed, nearly all of the deal consideration was allocated to goodwill and intangibles.

NRI protected the substantial investment it made in the goodwill associated with the employees of ATM. It signed new restrictive covenant agreements with key ATM employees: Domingue, Alvin Bell, and Ruben Reynoso. Those restrictive covenants included noncompetition, confidentiality, and nonsolicitation agreements. After the acquisition, NRI continued to employ Domingue, Bell, and Reynoso and permitted them to operate with relative autonomy.

After losing the opportunity to acquire ATM's business in a fair process, Plant Services instead turned to corporate raiding. Plant Services hired away two of the key men from ATM's metal fabrication shop, Bell and Reynoso. Plant Services knew that both Bell and Reynoso had signed noncompetition agreements with NRI and were critical to NRI's continued operation of ATM's metal fabrication shop, but Plant Services nevertheless induced them to breach their noncompetition agreements.

On their way out, Bell and Reynoso stole ATM's business-critical intellectual property. Almost immediately upon starting their new employment with Plant Services, Bell and Reynoso set about soliciting ATM's customers.

The Defendants' collective actions, more specifically detailed herein, have not only misappropriated the assets and goodwill that NRI purchased, but also destroyed NRI's ability to continue operating the metal fabrication business. NRI is therefore forced to file this lawsuit to seek damages for Defendants' conduct.

## PARTIES

1.      Plaintiff NRI ATM, LLC is a limited liability company organized and existing under the laws of the state of Delaware. NRI Holding Company, LLC is the sole member of NRI ATM, LLC. NRI Holding Company, LLC is a limited liability company organized and existing under the laws of the state of Delaware. PCB NRI Blocker Feeder, Inc. is the sole member of NRI Holding Company, LLC. PCB NRI Blocker Feeder, Inc. is a corporation organized and existing under the laws of the state of Delaware whose principal place of business is in Illinois. For ease of reference, where appropriate, these NRI entities are collectively referred to herein as "NRI."

2.      Plant Services, Inc. is a corporation organized and existing under the laws of the state of Montana with its principal place of business in Worden, Montana. Plant Services, Inc.

2

has not designated an agent for service of process in Texas. Plant Services, Inc. may be served with process in accordance with Rule 4(h)(1)(A) by serving the Texas Secretary of State, its agent for service pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044(b) and Texas Business Organizations Code §§ 5.251, 5.252, at Service of Process, Secretary of State, James Earl Rudder Building, 1019 Brazos St. Room 105, Austin, Texas 78701.

3.      Metal Works, Inc. is a corporation organized and existing under the laws of the state of Montana with its principal place of business Worden, Montana. Metal Works, Inc. may be served with process by serving its registered agent, Registered Agents, Inc. at 5900 Balcones Drive, Suite 100, Austin, Texas 78731. On information and belief, Metal Works, Inc. is a wholly-owned subsidiary of Plant Services, Inc.

4.      Alvin Bell is an individual who resides in Beaumont, Texas. Mr. Bell may be served with process at 4888 South Garden Drive, Beaumont, Texas 77705 or wherever he may be found.

5.      Ruben Reynoso is an individual who resides in Port Arthur, Texas. Mr. Reynoso may be served with process at 7916 Cowpen Rd, Orange, Texas. 77632 or wherever he may be found.

## JURISDICTION & VENUE

6.      This Court has personal jurisdiction over Plant Services, Inc. and Metal Works, Inc. under Tex. Civ. Prac. & Rem. Code § 17.042, the Texas long arm statute, because they contract with Texas residents, perform services, manufacture products, recruit Texas residents for employment, and have committed tortious acts (as alleged herein) within the state of Texas.

7.      This Court has personal jurisdiction over the individual defendants because each of the individual defendants is a resident citizen of the state of Texas.

8.      This Court has subject matter jurisdiction over NRI's claims for misappropriation of trade secrets under 18 U.S.C. § 1836(c) because that claim arises under the laws of the United States. 28 U.S.C. § 1331. The Court also has supplemental jurisdiction over Plaintiff's claims arising under Texas state law pursuant to 28 U.S.C. § 1367 because each of the Texas state law claims arises out of a common nucleus of operative fact from the claims arising under the laws of the United States.

9.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs and is between citizens of different States.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as it is the district in which a substantial part of the events or omissions giving rise to Plaintiff's claims occurred.

## FACTUAL ALLEGATIONS

### A.      ATM Sells It Assets to NRI.

11.     Non-party ATM Machine Works, Inc. ("ATM") was a Texas corporation in the business of custom metal fabrication.

12.     Non-party Alfred Domingue Jr. ("Domingue") was the sole owner of ATM. Two of ATM's major customers were NRI and Plant Services, for whom it manufactured custom clamps.

13.     NRI is a manufacturer of composite materials used in the oil and gas industry. Some of NRI's primary products are used for the installation, repair, and maintenance of pipelines and processing facilities in the oil and gas industry.

14.     In some limited instances, composite materials are not the proper engineering solution for one of NRI's customers. In those instances, NRI's customers may prefer clamps or

other physical solutions for the installation, maintenance, or repair of pipes. In those instances, NRI offers its clients a custom clamp as an "add on" product. NRI used ATM as a vendor to fabricate those clamps.

15.     Modern metal fabrication of this type involves sophisticated, computer-run equipment. That equipment allows a human operator to program a computer interface, which directs the equipment to manipulate a tool to precise specifications. For example, in the case of a plasma cutter, the computer's instructions direct the machine to move and fire a plasma torch across a two-dimensional grid, resulting in precise and efficient cuts to a piece of sheet metal stock.

16.     ATM's metal fabrication shop contained various computer-controlled equipment, including a plasma cutter and other computer-numeric-controlled ("CNC") equipment.

17.     On information and belief, the optimization of the CNC equipment and the development of processes to run ATM's machine shop were the result of thousands of man-hours of investment by ATM's employees as part of their employment with ATM.

18.     Plant Services is one of NRI's competitors. It also sells custom clamps to customers in the oil and gas industry. ATM (and later NRI) fabricated those clamps for Plant Services.

19.     During 2018, Domingue and NRI began discussing the possibility of a transaction in which NRI would acquire ATM's assets and goodwill to allow Domingue to retire. NRI considered the proposed transaction beneficial because it would allow ATM to continue to offer the custom clamps it ordered from ATM while achieving a hoped-for long-term cost savings associated with bringing the ATM fabrication business in-house.

20.     Upon information and belief, Metal Works, a division of Plant Services, or Plant Services itself was also discussing a transaction with Domingue at the same time.

21.     Ultimately, NRI was the successful purchaser of ATM's assets.

22.     On or about December 13, 2018, NRI ATM LLC, ATM, and Domingue entered into an Asset Purchase Agreement ("Agreement"), whereby ATM, as the seller, agreed to sell and assign substantially all of its assets, including tangible assets, receivables, contracts, customer relationships, intellectual property, and goodwill (the "Transferred Assets") to NRI.

23.     In total, NRI agreed to pay Domingue millions of dollars in the asset-purchase transaction. Those assets included the trade secrets, confidential business information, and goodwill of the ATM business. The remaining assets, such as equipment, inventory, and materials, did not carry significant value because much of the equipment in the ATM machine shop was outdated.  As a result, the parties agreed to allocate only a small fraction of the total deal consideration to fixed assets.

24.     One of the assets that NRI acquired as part of the asset purchase was a San Disc external storage device. This particular device was an important part of ATM's day-to-day operations because it contained software that allowed for the conversion of customer specifications into patterns that allow for fabrication of physical components.

**B.      NRI Continues to Employ Key ATM Personnel.**

25.     In addition to acquiring the assets of NRI and continuing operations at the Facility, NRI agreed to continue to employ certain ATM employees.

26.     On December 6, 2018, NRI extended and on December 11, 2018, Bell accepted an offer of full time employment with NRI ("Bell Employment Agreement").

27.     Under the terms of the Bell Employment Agreement, NRI agreed to pay Bell $60 per hour while Bell was employed with NRI.

DM2\12683961.1

28.     In March 2020, Bell received 50% of his annualized base compensation ($75,000) as a bonus.

29.     Bell acknowledged that in consideration of his compensation from NRI, that in the course of his employment with NRI, he will become familiar with "trade secrets, business plans and business strategies and with other Confidential Information" concerning NRI and its affiliates. Bell further acknowledged that his services to NRI were and would be special, unique and of extraordinary value to NRI and its affiliates.

30.     Bell agreed that he would not use or disclose any trade secrets or Confidential Information to anyone during or after his employment.

31.     The Bell Employment Agreement defined Confidential Information to include, among other things, "trade secrets, knowhow, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto and inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information."

32.     Bell further agreed in the Bell Employment Agreement that in exchange for his compensation he would not directly or indirectly, work for, own any interest in, operate, manage, promote, control, engage in, participate in, invest in, permit his name to be used by, consult with, advise, render services for or otherwise assist in any manner any business that is in competition with NRI during his employment and for 24 months after the termination of his employment (the "Bell Noncompete Period").

33.     Bell also agreed in the Bell Employment Agreement that in exchange for his compensation that during the Bell Noncompete Period he would not, directly or through another person, induce or attempt to induce any employee of NRI or its affiliates to leave that person's

7

employment in a way to interfere with the relationship between NRI or its affiliates and any employee. Bell also agreed during the Bell Noncompete Period he would not, directly or through another person, hire any person who was an employee of NRI or an affiliate at any time during the one-year period immediately preceding the termination of his employment with NRI. Finally, Bell also agreed during the Bell Noncompete Period he would not, directly or through another person, call on, solicit or service any customer, subcontractor, supplier, licensee, licensor, franchisee or other business relation of NRI or any of its affiliates for the purpose of inducing or attempting to induce that person to cease doing business or reduce the business done with NRI or its affiliates.

34.     Bell was one of the two most senior individuals employed at ATM. Bell's responsibilities with ATM included running the day-to-day operations of ATM's shop, operating equipment, and acting as a draftsman who converted client specifications to drawings that could be used by ATM's staff to manufacture parts for client orders.

35.     After NRI acquired ATM's assets, Bell's responsibilities with NRI continued. Bell maintained significant interaction with ATM's customers, including Plant Services. Bell also continued his responsibilities as a skilled laborer in the fabrication of products and components for NRI and ATM's other customers, including Plant Services. Bell's position of authority and his fabrication work provided him with daily access to the confidential and proprietary information NRI purchased from ATM.

36.     On December 6, 2018, NRI extended and on December 11, 2018, Reynoso accepted an offer of full time employment with NRI ("Reynoso Employment Agreement").

37.     Under the terms of the Reynoso Employment Agreement, NRI paid Reynoso $60 per hour during his employment with NRI.

DM2\12683961.1

38.     In March 2020, Reynoso received 50% of his annualized base compensation ($75,000) as a bonus.

39.     Reynoso acknowledged that in consideration of his compensation from NRI, that in the course of his employment with NRI, he will become familiar with "trade secrets, business plans and business strategies and with other Confidential Information" concerning NRI and its affiliates. Reynoso further acknowledged that his services to NRI were and would be special, unique and of extraordinary value to NRI and its affiliates.

40.     Reynoso agreed that he would not use or disclose any trade secrets or Confidential Information to anyone during or after his employment.

41.     The Reynoso Employment Agreement defined Confidential Information to include, among other things, "trade secrets, knowhow, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto and inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information."

42.     Reynoso further agreed in the Reynoso Employment Agreement that in exchange for his compensation he would not directly or indirectly, work for, own any interest in, operate, manage, promote, control, engage in, participate in, invest in, permit his name to be used by, consult with, advise, render services for or otherwise assist in any manner any business that is in competition with NRI during his employment and for 24 months after the termination of his employment (the "Reynoso Noncompete Period").

43.     Reynoso also agreed in the Reynoso Employment Agreement that in exchange for his compensation, during the Reynoso Noncompete Period he would not, directly or through another person, induce or attempt to induce any employee of NRI or its affiliates to leave that

person's employment in a way to interfere with the relationship between NRI or its affiliates and any employee. Reynoso also agreed during the Reynoso Noncompete Period he would not, directly or through another person, hire any person who was an employee of NRI or an affiliate at any time during the one year period immediately preceding the termination of his employment with NRI.

44.     Reynoso also agreed during the Reynoso Noncompete Period he would not, directly or through another person, call on, solicit or service any customer, subcontractor, supplier, licensee, licensor, franchisee or other business relation of NRI or any of its affiliates for the purpose of inducing or attempting to induce that person to cease doing business or reduce the business done with NRI or its affiliates.

45.     While employed by NRI, Reynoso continued his employment responsibilities to ATM. Reynoso was one of the two most senior individuals employed at ATM. Reynoso's responsibilities included management of the machine shop and its employees. After NRI acquired ATM's assets, Reynoso's responsibilities continued. Reynoso maintained significant interaction with ATM's customers, including Plant Services. Reynoso also continued his responsibilities as a skilled laborer in the fabrication of products and components for NRI and ATM's other customers, including Plant Services. Reynoso's position of authority and his fabrication work provided him with daily access to ATM and NRI's proprietary information.

46.     On December 6, 2018, NRI extended and on December 11, 2018, Domingue accepted an offer of full time employment with NRI ("Domingue Employment Agreement"). Domingue was paid $70 per hour while employed with NRI.

47.     Domingue acknowledged that in consideration of his compensation from NRI, that in the course of his employment with NRI, he will become familiar with "trade secrets,

business plans and business strategies and with other Confidential Information" concerning NRI and its affiliates. Domingue further acknowledged that his services to NRI were and would be special, unique and of extraordinary value to NRI and its affiliates.

48.     Domingue agreed that he would not use or disclose any trade secrets or Confidential Information to anyone during or after his employment.

49.     The Domingue Employment Agreement defined Confidential Information to include, among other things, "trade secrets, knowhow, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, documentation, models, data and data bases relating thereto and inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports and all similar or related information."

50.     Domingue further agreed in the Domingue Employment Agreement that in exchange for his compensation he would not directly or indirectly, work for, own any interest in, operate, manage, promote, control, engage in, participate in, invest in, permit his name to be used by, consult with, advise, render services for or otherwise assist in any manner any business that is in competition with NRI during his employment and for 24 months after the termination of his employment (the "Domingue Noncompete Period").

51.     Domingue also agreed in the Domingue Employment Agreement that in exchange for his compensation that during the Domingue Noncompete Period he would not, directly or through another person, induce or attempt to induce any employee of NRI or its affiliates to leave that person's employment in a way to interfere with the relationship between NRI or its affiliates and any employee. Domingue also agreed during the Domingue Noncompete Period he would not, directly or through another person, hire any person who was an employee of NRI or

an affiliate at any time during the one year period immediately preceding the termination of his employment with NRI.

52.     Domingue also agreed during the Domingue Noncompete Period he would not, directly or through another person, call on, solicit or service any customer, subcontractor, supplier, licensee, licensor, franchisee or other business relation of NRI or any of its affiliates for the purpose of inducing or attempting to induce that person to cease doing business or reduce the business done with NRI or its affiliates.

53.     While employed by NRI, Domingue was responsible for transitioning the ATM business from ATM to ATM NRI, LLC and assisting with setting up the new business within NRI's operations. Domingue's employment with NRI ended on March 13, 2019.

54.     After the asset sale, ATM NRI, LLC continued to function with relative independence from the remaining NRI entities. NRI placed a great amount of trust and confidence in Domingue, Bell, and Reynoso to continue to operate ATM NRI, LLC's business. Dominuge, Bell, and Reynoso managed the day-to-day affairs of ATM NRI, LLC free from significant oversight by the other NRI entities.

55.     After Domingue's departure, Bell and Reynoso continued to operate ATM NRI, LLC relatively independently from the other NRI entities. NRI continued to place the same trust and confidence in Bell and Reynoso.

56.     One of the reasons NRI was comfortable allowing Bell and Reynoso to operate with such autonomy was because NRI was providing both individuals with generous compensation in exchange for each individual's agreement to post-employment confidentiality, noncompetition, and nonsolicitation covenants.

DM2\12683961.1

57.     The customers of ATM and NRI typically order parts from ATM on a purchase order basis. ATM does not generally have long-term contracts with customers. As a result, ATM's business goodwill and ability to continue filling purchase orders is an extremely significant part of the value of ATM's assets. The loss of any of NRI's goodwill therefore has an extremely detrimental effect on NRI's business.

**C.     Defendants Breach Their Fiduciary Duties to NRI and Breach Their Employment Agreements with NRI.**

58.     On March 16, 2020, Reynoso resigned his employment with NRI and left NRI's employment without notice. Reynoso did not provide an explanation for his departure or say where he planned to work in the future.

59.     On April 2, 2020, Bell resigned his employment with NRI and left NRI's employment without notice. Bell did not provide an explanation for his departure or say where he planned to work in the future.

60.     Nearly simultaneously with the departures of Bell and Reynoso, Plant Services' orders for goods to NRI abruptly ended. Since hiring Bell and Reynoso, Plant Services has not sent any additional purchase orders to NRI.

61.     After the employment of Bell and Reynoso terminated, NRI discovered that the San Disc was missing.

62.     The San Disc was a necessary and central piece of equipment for the operation of ATM's business. Losing the San Disc severely limited NRI's ability to continue to fabricate custom parts efficiently, either for its own use or on behalf of any customers.

63.     Having worked in and managed ATM's shop for many years, Bell and Reynoso were aware that the San Disc was critical to the shop's continued operations.

DM2\12683961.1

64.     On information and belief, Bell or Reynoso carried the San Disc off from the ATM machine shop.

65.     On information and belief, all Defendants were aware of the misappropriation of the San Disc.

66.     On information and belief, Bell or Reynoso took with them proprietary drawings and electronically-stored information concerning the operation of NRI's business.

67.     On information and belief, Bell and Reynoso have used the trade secrets and confidential business information they took from ATM for the benefit of Metal Works and Plant Services.

68.     Metal Works and Plant Services knew or should have known that the information brought to them by Bell and Reynoso constituted NRI's trade secrets.

69.     Upon information and belief, immediately upon ending their employment with NRI, Bell and Reynoso began working for Metal Works. By hiring Bell and Reynoso, Metal Works gained access to the significant investment ATM and NRI had already spent optimizing its manufacturing processes without having to invest the time and money to refine its own processes. By hiring Bell and Reynoso, Metal Works was able to take wrongful advantage of the goodwill and significant investment that ATM and NRI had made in Bell and Reynoso.

70.     While employed by Metal Works, Bell and Reynoso began calling on NRI's customers to inform the customers that Bell and Reynoso now worked for Metal Works.

71.     Upon information and belief, Bell and Reynoso used NRI's confidential information, customer lists, and other trade secrets in order to solicit ATM's former customers on behalf of Metal Works.

DM2\12683961.1

72.    The solicitations of ATM's customers by Bell and Reynoso constituted solicitations, in breach of the post-employment restrictive covenants of the Bell Employment Agreement and the Reynoso Employment Agreement.

73.    Bell's employment with Metal Works was in breach of the post-employment restrictive covenants of the Bell Employment Agreement.

74.    Reynoso's employment with Metal Works was in breach of the post-employment restrictive covenants of the Reynoso Employment Agreement.

75.    On information and belief, the solicitations by Bell and Reynoso to NRI's customers were made either at the express direction of Metal Works or with Bell and Reynoso's intention to serve the interests of Metal Works.

76.    The ATM customers Bell and Reynoso solicited included On-Line Repair Solutions and A1 Leak Repair.

77.    Metal Works knew or should have known the critical importance that Bell and Reynoso played in NRI's continued operation of the ATM machine shop. On information and belief, either Metal Works or its parent company Plant Services had significant discussions with Domingue regarding a transaction wherein Dominuge would sell some or all of ATM's business to Plant Services or Metal Works. On information and belief, Metal Works knew, either from its own due diligence, or through conversations with Bell and Reynoso that Bell and Reynoso were the most senior employees and managers of the ATM division of NRI.

78.    Metal Works knew or should have known that Bell and Reynoso planned to misappropriate NRI's trade secrets and other confidential business information and use it in their employment at Metal Works.

79.     On information and belief, Metal Works was aware of the terms of the Bell Employment Agreement before it hired Bell.

80.     On information and belief, Metal Works was aware of the Reynoso Employment Agreement before it hired Reynoso.

81.     On information and belief, before hiring Bell and Reynoso, Plant Services engaged an attorney to review the terms of the Bell Employment Agreement and the Reynoso Employment Agreement.

82.     In spite of its knowledge that Bell and Reynoso had agreed to post-employment restrictive covenants with NRI, Metal Works nevertheless actively encouraged Bell and Reynoso to breach those agreements by taking employment with Metal Works.

83.     Metal Works and Plant Services induced Bell and Reynoso to breach the fiduciary duties they owed to NRI by at least misappropriating confidential information, removing business-critical software from the machine shop, and soliciting NRI's customers to cease doing business with NRI.

84.     Metal Works knew or should have known that Bell and Reynoso's departure, competition with ATM, and solicitation of ATM's clients would cause significant harm to NRI.

85.     Metal Works conspired with Bell and Reynoso to misappropriate NRI's trade secrets and confidential information and to compete with NRI in breach of their respective employment agreements and fiduciary duties to NRI.

## CAUSES OF ACTION

### Count I – Misappropriation of Trade Secrets
### 18 U.S.C. § 1836 (Defendant Trade Secrets Act)

86.     NRI reincorporates the allegations in the preceding paragraphs as if fully set forth herein.

87.     As a result of its purchase of the assets of ATM, as well as its own additional investments, NRI owned a trade secret, and that trade secret is used in interstate commerce.

88.     NRI maintained, or took reasonable precautions to maintain, the secrecy of its trade secrets.

89.     Defendants misappropriated NRI's trade secrets.

90.     Metal Works knew or should have known that the information it acquired from Bell and Reynoso was confidential, proprietary, and trade secret information belonging to NRI and that NRI had not authorized Bell or Reynoso to share the information with Metal Works.

91.     NRI was damaged by Defendants misappropriation of NRI's trade secrets in an amount to be proven at trial.

92.     Because Defendants acted willfully and maliciously, NRI is entitled to exemplary damages.

### Count II –Misappropriate Trade Secrets
### Chapter 134A Texas Civil Practice and Remedies Code (Texas Uniform Trade Secrets Act)

93.     NRI reincorporates the allegations in the preceding paragraphs as if fully set forth herein.

94.     As a result of its purchase of the assets of ATM, as well as its own additional investments, NRI owned a trade secret as demonstrated above and as defined in Section 134A.002(6) of the Texas Civil Practice and Remedies Code.

95.     NRI took reasonable efforts to maintain the secrecy of the information.

96.     NRI's trade secrets have independent economic value because the information is generally unknown to third parties and is not readily ascertainable through proper means.

97.     Defendants misappropriated NRI's trade secrets by acquiring the trade secrets through improper means and disclosing the trade secret without NRI's consent as defined in Section 134A.002(3) of the Texas Civil Practice and Remedies Code.

98.     NRI was damaged by Defendants misappropriation.

99.     Because Defendants willfully and maliciously misappropriated NRI's trade secret, NRI is entitled to exemplary damages according to Section 134A.004(b) of the Texas Civil Practice and Remedies Code.

100.    Pursuant to Section 134A.005(3) of the Texas Civil Practice and Remedies Code.NRI is entitled to its reasonable attorney's fees because Defendants willfully and maliciously misappropriated NRI's trade secret.

## Count III – Conspiracy to Misappropriate Trade Secrets

101.    NRI reincorporates the allegations in the preceding paragraphs as if fully set forth herein.

102.    Defendants are members of a combination of two or more persons and the object of their combination was to misappropriate NRI's trade secrets and unlawfully compete with NRI.

103.    Defendants had a meeting of the minds regarding the misappropriation of NRI's trade secrets and Defendants subsequently misappropriated NRI's trade secrets.

104.    NRI has been damaged as a result of the Defendants wrongful acts in an amount to be proven at trial and within the jurisdiction limits of this Court.

## Count IV – Breach of Fiduciary Duty

105.    NRI reincorporates the allegations in the preceding paragraphs as if fully set forth herein.

DM2\12683961.1

106.    Bell and Reynoso were in positions of trust with NRI and each had a fiduciary relationship with NRI.

107.    Bell and Reynoso had a fiduciary duty to NRI to act in a manner consistent with NRI's trust in each of them and to exercise the utmost good faith and loyalty in the performance of their duties.

108.    Bell and Reynoso had a fiduciary duty to act solely in NRI's best interest, free from any self-dealing, conflicts of interest, or other abuse of NRI for their personal advantage.

109.    Bell and Reynoso breached their fiduciary duties by misappropriating confidential information belonging on NRI.

110.    Bell and Reynoso also breached their fiduciary duties to NRI unrelated to the preservation of confidentiality of information including, without limitation, by soliciting NRI's customers to Metal Works, breaching their noncompetition agreements, and by incapacitating NRI's CNC equipment.

111.    As a direct result of the breaches, NRI has suffered actual damages in an amount to be proven at trial and within the jurisdictional limits of this Court.

112.    Because Bell and Reynoso acted with malice and/or fraud, NRI is entitled to exemplary damages. TEX. CIV. PRAC. & REM. CODE § 41.003(a).

### Count V – Aiding and Abetting Breach of Fiduciary Duty

113.    NRI reincorporates the allegations in the preceding paragraphs as if fully set forth herein.

114.    Metal Works knowingly induced Bell and Reynoso to breach their fiduciary duties to NRI.

115.    As detailed herein, Bell and Reynoso breached their fiduciary duties to NRI and NRI was damaged as a result of the breach.

19

116.   NRI has also been damaged as a result of Metal Works aiding and abetting Bell and Reynoso in the breach of their fiduciary duties in an amount to be proven at trial and within the jurisdictional limits of this Court.

### Count VI – Unfair Competition

117.   NRI reincorporates the allegations in the preceding paragraphs as if fully set forth herein.

118.   As described herein, Defendants' wrongful conduct constitutes an unlawful act that interfered with NRI's ability to conduct its business.

119.   Defendants' wrongful conduct is independently tortious, illegal, unfair, and contrary to accepted business ethics.

120.   Specifically, Defendants' misappropriated and conspired to misappropriate, and used NRI's trade secrets and confidential information, which was created by NRI through its expenditure of labor, skill, and money.

121.   Bell and Reynoso also breached their fiduciary duties to NRI unrelated to the preservation of confidentiality of information including, without limitation, by soliciting NRI's customers to Metal Works, breaching their noncompetition agreements, and by incapacitating NRI's CNC equipment.

122.   As a result of Defendants' conduct, NRI has suffered actual damages in an amount to be proven at trial and within the jurisdictional limits of this Court.

123.   Because Defendants acted with malice and/or fraud, NRI is entitled to exemplary damages. TEX. CIV. PRAC. & REM. CODE § 41.003(a).

### Count VII – Conversion

124.   NRI reincorporates the allegations in the preceding paragraphs as if fully set forth herein.

125.     As described above, NRI owned, possessed, or had the legal right to immediate possession of its trade secrets and/or confidential information and the San Disc.

126.     Defendants wrongfully exercised dominion or control over NRI's property in denial of and/or inconsistent with NRI's rights.

127.     Defendants' improper exercise of dominion or control over NRI's property extended to both NRI's tangible personal property as well as NRI's intangible property that was merged into tangible property.

128.     As a result of Defendants' conversion of NRI's property, NRI has suffered actual damages in an amount to be proven at trial within the jurisdictional limits of this Court.

129.     Because Defendants acted with malice, NRI is entitled to exemplary damages. TEX. CIV. PRAC. & REM. CODE § 41.003(a).

### Count VIII – Tortious Interference with Existing Contract

130.     NRI reincorporates the allegations in the preceding paragraphs as if fully set forth herein.

131.     NRI's employment agreements are valid contracts with Bell and Reynoso.

132.     Metal Works intentionally interfered with NRI's contracts with Bell and Reynoso by encouraging, inducing, and aiding each in the breach of their respective employment agreements.

133.     NRI has been damaged by Metal Works' interference with the employment agreement with Bell and Reynoso as each of the foregoing breached the noncompetition and nonsolicitation provisions of their employment agreements and began improperly competing with NRI.

134.     NRI has suffered actual damages in an amount to be proven at trial.

135.    Because Metal Works acted with malice, NRI is entitled to exemplary damages. TEX. CIV. PRAC. & REM. CODE § 41.003(a).

### Count IX – Tortious Interference with Prospective Relations

136.    NRI reincorporates the allegations in the preceding paragraphs as if fully set forth herein.

137.    There was a reasonably probability that NRI would have entered into continuing business relationships with its existing and other potential customers for custom metal fabrication.

138.    Defendants were aware of the advantageous relationships that NRI enjoyed with its customers.

139.    Defendants intentionally interfered with those advantageous relationships by destroying the ability of NRI to continue its custom metal fabrication business.

140.    Defendants' interference caused NRI to suffer injury.

141.    NRI has been damaged damages in an amount to be proven at trial within the jurisdictional limits of this Court.

142.    Because Defendants acted with malice, NRI is entitled to exemplary damages. TEX. CIV. PRAC. & REM. CODE § 41.003(a).

### Count X – Breach of Contract

143.    NRI reincorporates the allegations in the preceding paragraphs as if fully set forth herein.

144.    NRI entered into valid contracts, with Bell and Reynoso, as evidenced by the employment agreements between NRI and each of the foregoing defendants.

145.    The Bell and Reynoso employment agreements each contained a provision governing the use and protection of NRI's confidential and trade secret information, a provision

wherein Bell and Reynoso each agreed they would not compete, directly or indirectly, with NRI after their employment ended, and a provision wherein Bell and Reynoso each agreed that they would not solicit any customer of NRI.

146. NRI performed its obligations in the respective employment agreements.

147. Bell and Reynoso each breached his respective employment agreement by commencing employment with Metal Works in direct competition with NRI, by revealing and using NRI's confidential and trade secret information, and by actively soliciting NRI customers for the benefit of Metal Works.

148. NRI was damaged as a direct result of Bell and Reynoso's breaches and has suffered actual damages in an amount to be proven at trial and within the jurisdictional limits of this Court.

149. Because this is an action for breach of contract, NRI is entitled to recover its attorney's fees. TEX. CIV. PRAC. & REM. CODE § 38.001.

### Count XI – Violation of Texas Theft Liability Act

150. NRI reincorporates the allegations in the preceding paragraphs as if fully set forth herein.

151. NRI had a possessory right in its tangible property, the San Disc, and its intangible property, the trade secrets and other confidential business information, that had merged with the tangible property.

152. Defendants unlawfully appropriated NRI's personal property as defined in Section 134.002(2) of the Texas Civil Practice and Remedies Code.

153. Defendants unlawfully appropriated NRI's personal property as defined in Section 31.03 of the Texas Penal Code.

154.    Defendants unlawfully appropriated NRI's trade secrets and other confidential business information as defined in Section 31.05 of the Texas Penal Code.

155.    Defendants took NRI's property with intent to deprive NRI of its property.

156.    NRI suffered actual damages in an amount to be proven at trial and within the jurisdictional limits of this Court.

157.    Because this is an action under the Texas Theft Liability Act, NRI is entitled to its reasonable and necessary attorneys' fees and court costs. TEX. CIV. PRAC. & REM. CODE § 134.005.

### Count XII – Respondeat Superior

158.    NRI incorporates the preceding paragraphs as if set forth fully herein.

159.    Apart from its liability as a result of its own tortious acts, Metal Works is further vicariously liable to NRI under the doctrine of respondeat superior as Bell and Reynoso were at all relevant times acting at the express direction of or with an intention to benefit Metal Works.

160.    As a direct result of Defendants' conduct, NRI has suffered actual damages in an amount to be proven at trial and within the jurisdictional limits of this Court.

### PRAYER

For these reasons, NRI requests that Defendants be cited to appear and answer and, on final trial, that NRI have judgment against Defendants for:

   i.    Actual damages against Defendants;

  ii.    Exemplary damages against Defendants;

 iii.    NRI's reasonable and necessary attorneys' fees;

  iv.    Pre-judgment and post-judgment interest as allowed by law; and

   v.    Costs of court.

DM2\12683961.1

NRI also requests that it be awarded all other relief, at law or in equity, to which it may be justly entitled.

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY OF ALL ISSUES SO TRIABLE**

Respectfully submitted,

**DUANE MORRIS LLP**

By:/s/ *Cameron J. Asby*

    Cameron J. Asby
    Texas Bar No. 24078160
    cjasby@duanemorris.com
    1330 Post Oak Blvd., Suite 800
    Houston, Texas  77056
    Tel: (713) 402-3900
    Fax: (713) 402-3901

    Gregory S. Bombard (*pro hac vice* forthcoming)
    Massachusetts Bar No. 679720
    gbombard@duanemorris.com
    100 High Street, Suite 2400
    Boston, Massachusetts 02110
    Tel: (857) 488-4200
    Fax: (857) 488-4201

DM2\12683961.1